**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**JAMES DOCSTER,**

                        **Plaintiff,**

                v.                             3:03-CV-1193
                                                 (FJS/DEP)
**SAMUEL K. LEVENE; LAWRENCE J.**
**SCHORR; and LEVENE, GOULDIN &**
**THOMPSON, L.L.P.,**

                        **Defendants.**
_____

**APPEARANCES**                                      **OF COUNSEL**

**OFFICE OF EDWARD WEISSMAN**        **EDWARD WEISSMAN, ESQ.**
60 East 42nd Street                              **JAN MARCANTONIO, ESQ.**
47th Floor
New York, New York 10165
Attorneys for Plaintiff

**COSTELLO, COONEY & FEARON, P.L.L.C.**    **PAUL G. FERRARA, ESQ.**
3 Atrium Drive
Suite 210
Albany, New York 12205
Attorneys for Defendants

**SCULLIN, Chief Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

      Plaintiff alleges that Defendants committed legal malpractice by representing the interest of Jack Docster, Plaintiff's father and partner, against Plaintiff in connection with a foreclosure action on a certain parcel of land that contained a 35,000 square foot building in which Plaintiff allegedly had a fifty-percent interest. Plaintiff claims that he lost his fifty-percent share of equity

in the building as a result of Defendants' malpractice.

Defendants have filed a counterclaim, pursuant to Rule 11 of the Federal Rules of Civil Procedure, for sanctions against Plaintiff and his attorney on the grounds that Plaintiff did not commence this action in good-faith and that this action is frivolous and harassing because it has no reasonable basis in the law or in fact. *See* Answer at ¶¶ 29-30.[1]

## II.  BACKGROUND[2]

Plaintiff is a fifty-percent partner in J.D. Associates ("JDA"), is a shareholder of Dodge-Markham, Inc. ("DM"), and is a fifty-percent owner of DDW Forms Group, Inc. ("DDW") and Precision Time Card, Inc. ("Precision") (together the "Docster entities"). *See* Defendants' Statement of Undisputed Facts ("DSUF") at ¶ 2. The other partner, shareholder, and owner of the Docster entities is Plaintiff's father, Jack Docster. *See id.* at ¶ 3. Defendants began representing the Docster entities in 1996. *See id.* at ¶ 7. Subsequent to 1996, Defendants also handled several personal legal matters for Jack Docster. *See id.*

In 1996, the Docster entities gained a new account to produce post cards for a franchise business. In order to facilitate the account, the Docster entities decided to construct a new building directly behind the existing JDA facility. In order to finance the construction, they obtained a commercial loan from Binghamton Savings Bank ("BSB").

During the next two years, the financial situation of the Docster entities declined, and they, along with Jack Docster, were forced to refinance their existing loans with BSB on

---

[1] Defendants did not address this counterclaim in their current motion.

[2] Unless the Court notes otherwise, the parties do not dispute these facts.

December 31, 1998.

In December 1999, the Docster entities were once again forced to refinance their existing loans with BSB. At the same time, BSB began contacting Plaintiff in an attempt to collect on the personal guarantees that Plaintiff had signed for the BSB line of credit.

On February 8, 2000, BSB commenced an action against Plaintiff based on the personal guarantees that he had signed. *See* Defendants' Exhibit "37." Mr. James Cahill represented Plaintiff in that lawsuit. On February 12, 2000, Mr. Cahill met with Defendants to discuss the circumstances surrounding the Docster entities, at which time he expressed his concern about a possible conflict of interest resulting from Defendants' simultaneous representation of the Docster entities and Jack Docster. *See* Defendants' Exhibit "17" at 78-79.

In March 2000, the loans to BSB for the new building were in arrears. *See* Defendants' Exhibit "14" at 22; Plaintiff's Exhibits "A" & "B." By May 2000, all of the loans that the Docster entities had taken from BSB were in arrears. *See* Defendants' Exhibit "13" at 118-19; Defendants' Exhibit "15" at 24-25.

On June 8, 2000, Mr. Cahill and Defendants met to discuss a DM shareholders meeting scheduled for June 12, 2000. At that meeting, Mr. Cahill again expressed his concern regarding a conflict of interest resulting from Defendants' simultaneous representation of the Docster entities and Jack Docster. *See* Defendants' Exhibit "17" at 78-80; Defendants' Exhibit "56."

On July 21, 2000, BSB commenced an action against Plaintiff for the cash surrender value of Plaintiff's remaining pledged life insurance policy. *See* Defendants' Exhibit "45." Mr. Cahill, on behalf of Plaintiff, filed an answer to BSB's complaint on August 2, 2000, in which he also included a third-party summons and complaint against, among others, Jack Docster, DDW,

and DM.  *See* Defendants' Exhibit "46."

On September 6, 2000, BSB commenced a real estate foreclosure action on the commercial loan taken out in the name of Jack Docster, which had been secured by parcels of land including the land where the new building was located.  *See* Defendants' Exhibit "48."

In September 2000, the Internal Revenue Service ("IRS") began collection proceedings against DDW and DM for failure to pay federal withholding taxes.  *See* Defendants' Exhibit "50."  Plaintiff and Jack Docster where also named as Defendants in those actions.  Attorney John Ball represented Plaintiff, and Defendants represented Jack Docster in those matters.

On October 2, 2000, BSB commenced another real estate foreclosure action against JDA.  *See* Defendants' Exhibit "52."  On the same day, Defendants appeared on behalf of Jack Docster, DDW, DM, and JDA in Plaintiff's third-party action. *See* Defendants' Exhibit "47."

Following the service of the JDA foreclosure action, Mr. Cahill advised Defendants that they were not to appear on behalf of Plaintiff.  *See* Defendants' Exhibit "12" at 219-20; Defendants' Exhibit "16" at 65, 108-09; Defendants' Exhibit "17" at 89.  Accordingly, Mr. Cahill served an amended answer, cross-claim, and counterclaim in the JDA foreclosure action on behalf of Plaintiff, JDA, DDW, and DM.  *See* Defendants' Exhibit "53."  In the answer, each of the parties asserted various counterclaims against Jack Docster.  *See id.*

On November 22, 2000, Defendants, on behalf of Jack Docster, served an answer in the JDA foreclosure case.  *See* Defendants' Exhibit "54."  Neither Plaintiff nor Mr. Cahill ever filed a motion to disqualify Defendants from representing Jack Docster or any of the Docster entities in the BSB foreclosure action.

On March 1, 2001, judgment was entered for BSB in the Jack Docster foreclosure action

-4-

in the amount of $505,387.12. *See* Defendants' Exhibit "84." On March 1, 2002, Mr. Cahill filed an order to show cause seeking permission for JDA to intervene in the Jack Docster foreclosure action. *See* Defendants' Exhibit "68." The court heard the application to intervene on March 6, 2002, and denied the application because JDA was not an owner of record when the foreclosure action was commenced. *See* Defendants' Exhibit "70;" Plaintiff's Exhibit "S" at 58-61.

On December 4, 2002, BSB served a notice of foreclosure sale for January 7, 2003, on the Jack Docster foreclosure parcels, which included the new building. *See* DSUF at ¶ 180. The sale took place on January 16, 2003, and BSB purchased the parcel of land, including the new building, for the amount of the outstanding loan. *See* Defendants' Exhibit "84."

On September 29, 2003, Plaintiff filed the present action against Defendants, alleging that their actions in the foreclosure actions constituted malpractice. *See* Dkt. No. 1.

On February 17, 2004, Jack Docster, DM, and DDW, through Defendants, entered into a global settlement with BSB regarding all claims against them. *See* Defendants' Exhibit "89." As a result of this settlement, BSB released Jack Docster, DM, and DDW from any deficiencies BSB was unable to collect. At some point, Plaintiff also entered into a global settlement agreement with BSB regarding all claims against him. *See* Defendants' Exhibit "17" at 25-26.

On June 30, 2004, a foreclosure sale was conducted with respect to the JDA foreclosure action. BSB purchased the premises; however, a deficiency of $615,995.91 remained. *See* Defendants' Exhibit "14" at 74-75.

Currently before the Court is Defendants' motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment with respect to Plaintiff's malpractice claim.

The Court heard oral argument in support of, and in opposition to, that motion on May 6, 2005, and reserved decision at that time. The following constitutes the Court's written disposition of the pending motion.

### III.  DISCUSSION

**A.     Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" only when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U .S. 242, 248 (1986). A material fact issue is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When evaluating the evidence, the court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion for summary judgment. *See Liscio v. Warren*, 901 F.2d 274, 276 (2d Cir. 1990) (citations omitted); *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990) (citation omitted). However, conclusory statements, conjecture and speculation are insufficient to defeat a motion for summary judgment. *See Opals on Ice Lingerie v. Body Lines Inc.*, 320 F.3d 362, 370 n.3 (2d Cir. 2003) (quotation omitted). Similarly, a plaintiff "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir.

2004) (quotation omitted). If the non-movant does not meet this burden, the court will grant summary judgment against it. *See id.* (citation omitted).

In support of their motion for summary judgment, Defendants assert that (1) Plaintiff's claim is barred by the statute of limitations; (2) no attorney-client relationship existed between Plaintiff and Defendants; (3) Plaintiff waived any alleged conflict of interest; (4) Defendants did not use any allegedly confidential information against Plaintiff; (5) Defendants were not the proximate cause of any alleged damages that Plaintiff sustained; (6) Plaintiff would not have been successful in the underlying matter; (7) Plaintiff did not sustain any pecuniary damages as a result of the alleged malpractice or conflict of interest; and (8) Plaintiff is not entitled to punitive damages. Since Defendants' statute-of-limitations argument is dispositive, the Court will address that issue first.

## B.     Statute of limitations

Before discussing the merits of Plaintiff's legal malpractice claim, the Court will address Defendants' argument that the applicable statute of limitations bars this action.

A plaintiff must commence an action to recover damages for legal malpractice within three years from the date of the alleged malpractice. *See* N.Y. C.P.L.R. § 214(6); *McCoy v. Feinman,* 99 N.Y.2d 295, 301 (2002). "The period of limitations in a legal malpractice action begins to run when the malpractice is committed . . . , not when the client discovers the injury." *Wells Fargo Home Mortgage, Inc. v. Zeichner, Ellman & Krause, LLP,* 5 A.D.3d 128, 128-29 (1st Dep't 2004) (internal citation omitted). "[P]laintiff's knowledge of the facts giving rise to the [malpractice] claim, rather than his knowledge of his legal right, is decisive," and determines

when the cause of action accrues and hence when the statute of limitations begins to run. *Cafferty v. Thompson,* 223 A.D. 2d 99, 101 (3d Dep't 1996) (citation omitted).

Defendants assert that Plaintiff's malpractice claim accrued in February or, at the latest, in June of 2000, and that, because Plaintiff did not file this action until September 2003, N.Y. C.P.L.R. § 214(6)'s three-year statute of limitations bars this action. In support of their assertion, Defendants have submitted the deposition of Mr. James Cahill, Plaintiff's attorney at the time, in which he indicated that he was concerned that Defendants' continued representation of both Plaintiff and his father constituted a conflict of interest "because of the possible diversity of interests between Jack and James Docster." *See* Defendants' Exhibit "17" at 78-81. Based upon Mr. Cahill's deposition testimony, it appears that Plaintiff knew, through his attorney, of the alleged conflict of interest – the basis for his malpractice claim – at some point between the months of February and June 2000.

Nonetheless, Plaintiff asserts that his malpractice claim did not accrue until March 1, 2001, the date that judgment was entered in favor of BSB in the Jack Docster foreclosure action because he did not have an actionable injury until that time; prior to that time, damages were unascertainable, and "a Court would have dismissed the claim as premature, since plaintiff had not sustained any actual loss." *See* Plaintiff's Memorandum of Law in Response to Defendants' Motion for Summary Judgment, dated February 24, 2005, at 6.

Plaintiff's reasoning is flawed. The case law clearly establishes that if Defendants' continued representation of both Plaintiff and Jack Docster constituted a conflict of interest, which, in turn, would constitute malpractice, then Plaintiff's injury arose at the time the conflict of interest began. *See Adamson v. Bachner,* No. 01 Civ. 10213, 2002 WL 31453096, * 2

(S.D.N.Y. Oct. 31, 2002) (citing *McCoy v. Feinman,* 291 A.D.2d 799, 737 N.Y.S.2d 481, 482-84 (4th Dep't 2002) (finding that the date of injury was the date of the malpractice)). Moreover, Plaintiff is incorrect in his assertion that he had no actionable injury until the judgment was entered in favor of BSB. Although Plaintiff may not have been able to sue for monetary relief for Defendants' alleged malpractice in June 2000, Plaintiff could have requested that the court enjoin Defendants from representing either party during the foreclosure action. *See William Kaufman Org., Ltd. v. Graham & James L.L.P.,* 263 A.D.2d 440, 441 (1st Dep't 1999) (injunctive relief is appropriate when a conflict of interest is present). Accordingly, the Court finds that Plaintiff's malpractice claim accrued at the time that Plaintiff was aware of Defendants' malpractice, which, at the latest, would have been in June 2000.

In the alternative, Plaintiff argues that, if the Court holds that his cause of action accrued at some point between February and June 2000, it should hold that the doctrine of continuous representation tolled the statute of limitations.

Under the doctrine of continuous representation, the statute of limitations is tolled where an attorney continues to represent the client concerning the matter in which the claim arises and remains tolled until the attorney's representation ends. *See Glamm v. Allen,* 57 N.Y.2d 87, 93-94 (1982) (citations omitted). However, this doctrine applies only when a plaintiff demonstrates ongoing representation concerning the specific matters from which his claim arises and applies only when there is "'clear indicia of an ongoing continuous, developing, and dependent relationship between the client and the attorney'" marked with trust and confidence. *Aaron v. Roemer, Wallens & Mineaux, L.L.P.,* 272 A.D.2d 752, 754 (3d Dep't 2000) (quotation omitted); *see also CLP Leasing Co., LP v. Nessen,* 784 N.Y.S.2d 535, 535-36 (1st Dep't 2004) (citations

omitted). On the other hand, the continuation of a general professional relationship does not indicate continuous representation. *See Nessen,* 784 N.Y.S.2d at 535. Finally, once a client consults with another attorney with respect to the matter in which his initial attorney represented him, continuous representation clearly ends because, at that point, the client is able to question the attorney's actions and to pursue remedies for perceived wrongs. *See Aaron,* 272 A.D.2d at 754 (citations omitted).

Defendants assert that their representation of Plaintiff ceased, at the latest, in June 2000. In support of their argument, Defendants contend that on February 10, 2000, James Cahill contacted them to inform them that Plaintiff had retained him as counsel. *See* Defendants' Exhibit "38." In addition, Mr. Cahill wrote Defendants on behalf of "[his] client James Docster" regarding a shareholder meeting. *See* Defendants' Exhibit "43." In addition, following the service of the complaint in the JDA foreclosure action in October 2000, Mr. Cahill specifically advised Defendants that they were not to appear, represent, or do anything on behalf of JDA or Plaintiff. *See* Defendants' Exhibit "12."

In response, Plaintiff argues that his relationship with Defendants in the BSB foreclosure action continued until October 2000. In support of his argument, Plaintiff points to several instances where Defendants performed research, re-structured the Docster entities, and submitted proposals to BSB, on behalf of the Docster entities, during the foreclosure action. Plaintiff asserts that, when Defendants took actions while representing the Docster entities, particularly JDA, they were in effect representing him since he was a partner of JDA and the other Docster entities.

Plaintiff's reasoning is flawed. It is well-established that, when an attorney represents a

-10-

partnership or a corporation, his duty runs with that entity and not with the individual partners, shareholders, directors, or other individuals. *See Quintel Corp., N.V. v. Citibank, N.A.,* 589 F. Supp. 1235, 1241-42 (S.D.N.Y. 1984) (citations omitted); *see also Evans v. Artek Sys. Corp.,* 715 F.2d 788, 792 (2d Cir. 1983) (citations omitted). Therefore, whether Defendants were representing JDA, or the other Docster entities for that matter, after September 2000, is irrelevant. The question is whether Defendants were representing Plaintiff after September 2000. Defendants' undisputed evidence shows that Plaintiff hired Mr. Cahill to represent his interests in the BSB foreclosure action in February 2000. Moreover, even when viewing the facts in the light most favorable to Plaintiff, the fact remains that June 2000 would not only constitute the latest date on which Plaintiff could claim that he retained Mr. Cahill to represent his interests, but it would also be the latest date on which Plaintiff knew about Defendants' alleged malpractice. Therefore, Plaintiff's malpractice claim accrued, at the latest, in June 2000, and, accordingly, the statute of limitations expired, at the latest, in June 2003. Since Plaintiff did not file his malpractice claim against Defendants until September 2003, the Court grants Defendants' motion for summary judgment on the ground that this action is time-barred.

### C.   Attorney-client relationship

Although the expiration of the applicable statute of limitations is sufficient to justify this Court granting Defendants' motion for summary judgment, in the interest of completeness, the Court will briefly discuss the merits of Plaintiff's claim.

To succeed in a legal malpractice action, a plaintiff has the burden of showing (1) the existence of an attorney-client relationship; (2) negligence on the part of the attorney or some

other conduct in breach of that relationship; (3) proof that the attorney's conduct was the proximate cause of the actual injury to the client; (4) that, but for the alleged malpractice, the plaintiff would have been successful in the underlying action; and (5) proof as to the amount that the plaintiff could have recovered in the underlying action. *See Wei Cheng Chang v. Pi,* 288 A.D.2d 378, 380 (2d Dep't 2001) (citations omitted); *Volpe v. Canfield,* 237 A.D.2d 282, 283 (2d Dep't 1997) (citations omitted).

In his complaint, Plaintiff argues that Defendants continued to perform work for the Docster entities to his detriment. However, as Defendants point out, none of the Docster entities are suing Defendants for malpractice, only Plaintiff, as an individual, is. Defendants were not in privity with Plaintiff and, therefore, no attorney-client relationship existed between them. *See Compis Servs., Inc. v. Greenman,* 789 N.Y.S.2d 369, 370 (4th Dep't 2005). Plaintiff presents no argument that raises an issue of material fact regarding the parties' relationship with one another. Furthermore, even if Plaintiff had an interest in the Docster entities, Defendants' obligation was not to represent Plaintiff as an individual but, rather, to represent the entities as a whole. *See Quintel Corp.,* 589 F. Supp. at 1241-42; *Evans,* 715 F.2d at 792. Moreover, it is clear, as discussed above, that Plaintiff retained his own counsel to represent him during the foreclosure actions. Accordingly, the Court finds that Plaintiff has failed to establish that an attorney-client relationship existed between him and Defendants and, therefore, he has failed to meet his burden to prove an essential element of his claim for legal malpractice. Accordingly, the Court grants Defendants' motion for summary judgment on this alternative grounds as well.

## IV.  CONCLUSION

After carefully considering the file in this matter, the parties' submissions and oral arguments, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Defendants' motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, is **GRANTED** in its entirety; and the Court further

**ORDERS** that the Clerk of the Court enter judgment in favor of Defendants and close this case.

**IT IS SO ORDERED.**

Dated: June 8, 2005
         Syracuse, New York

_____
Frederick J. Scullin, Jr.
Chief United States District Court Judge